IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                                CRIMINAL No. ELH-19-0065

PHILLIP SESSA,
*Defendant.*

**MEMORANDUM OPINION**

Defendant Phillip Sessa is currently on supervised release in Maryland in connection with his conviction in Louisiana for possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  *See United States v. Sessa*, 12-cr-045-RTH-PJH ("Louisiana Case").  The United States Probation Office ("USPO" or "Probation") seeks to modify Sessa's conditions of supervised release to add a polygraph condition.  ECF 9 ("Petition").[1]  Sessa opposes the proposed modification.  ECF 33; ECF 47.

Specifically, on August 7, 2023, Probation filed a request to modify defendant's conditions of supervised release.  ECF 9.  It asked to add the following special condition: "You must submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure that you are in compliance with the requirements of your supervision or treatment program."  *Id.* at 1.  The Petition indicated that the modification request was made with the "consent of the offender." *Id*.  Sessa also signed a waiver of his right to a hearing.  *See* ECF 9-1.  In addition, the probation officer indicated that she notified defense counsel of the proposed modification on July 26, 2023, but had not received a response.  *Id.* at 2.  Accordingly, I granted the Petition.  ECF 10.

---

[1] All citations to electronic court filings refer to the docket in this case, ELH-19-065, unless otherwise indicated.

On August 10, 2023, counsel for defendant filed a "Motion to Set Hearing to Modify Conditions." ECF 11. Defense counsel indicated that while "Mr. Sessa previously consented to the [polygraph] condition, that was before he had the opportunity to consult an attorney." *Id.* ¶ 9. Defense counsel also asserted: "Mr. Sessa does object to the polygraph testing condition." *Id.* And, through counsel, defendant filed a "Motion To Reject Modification Of Supervision" (ECF 33) and several exhibits. ECF 33-1 through ECF 33-4.

Accordingly, the Court scheduled a hearing on the modification. ECF 16. Thereafter, at the request of defense counsel (sometimes joined by the government), the hearing was postponed multiple times. *See* ECF 20; ECF 24; ECF 25; ECF 26; ECF 27; ECF 28; ECF 29; ECF 30; ECF 39. The Court ultimately held hearings on April 5, 2024 and April 10, 2024. ECF 34; ECF 36. Thereafter, at the request of counsel, the Court was asked to delay its ruling because a similar request was under advisement by another judge of this Court. ECF 39.

Thereafter, Sessa filed a supplemental brief. ECF 47. I shall refer to the defense filings at ECF 11, ECF 33, and ECF 47 collectively as the "Motion." The government opposes the Motion and joins USPO's polygraph request. ECF 48 ("Opposition"). Sessa has replied. ECF 50 ("Reply").

For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I. Factual and Procedural Background

On February 15, 2012, in the United States District Court for the Western District of Louisiana, Lafayette Division, Sessa was indicted and charged with one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Louisiana Case, ECF 6. The

Indictment alleged that on November 18, 2011, Sessa "knowingly and intentionally" possessed "images of child pornography." *Id.*[2]

Pursuant to a Plea Agreement (*id.*, ECF 35), defendant entered a plea of guilty on July 23, 2012. *Id.*, ECF 34. The Plea Agreement included a "Stipulated Factual Basis for Guilty Plea." *Id.*, ECF 35-3. It recounts that on November 18, 2011, the Louisiana State Police executed a search warrant at Sessa's residence in Opelousas, Louisiana. *Id.* at 1. Agents located computer hard drives at the residence, previewed them, and found that they contained child pornography. *Id.* "Sessa advised agents that he downloaded the child pornography recovered by the agents from his computer." *Id.* A forensic analysis of Sessa's computer hard drives, electronic storage devices, and other storage media seized from his residence, revealed more than one thousand images and videos of child pornography belonging to Sessa, the "majority" of which he obtained from the internet. *Id.*

Sentencing was held on February 19, 2013. *Id.*, ECF 45. Judge Richard T. Haik, Sr. sentenced Sessa to 97 months of imprisonment and fifteen years of supervised release. *Id.*, ECF 47 (Judgment), at 2, 3.[3]

The Judgment listed mandatory and standard conditions of supervision, *id.* at 3, as well as special conditions of supervision. *Id.* at 4. The special conditions include: (1) participation in a sex offender treatment program, "which may include the application of psychological testing instruments, until discharged"; (2) prohibition on subscription to "any internet provides [sic]" or

---

[2] A criminal complaint was filed against Sessa on January 26, 2012, for the same conduct. Louisiana Case, ECF 1.

[3] Curiously, the Judgment indicates that defendant "pleaded guilty to count(s): 2 of the Indictment." Louisiana Case, ECF 47 at 1. But, the same page of the Indictment shows that "defendant is adjudicated guilty" of possession of child pornography, which is listed as Count One. *Id.* And, as noted, the Indictment contained only one count. *Id.*, ECF 6.

using "the services of the internet without approval of the Probation Office"; (3) prohibition on association with any minor unless the minor's legal parent or guardian is present; (4) prohibition of possession or use of any form of pornography, or entering "any location where pornography can be accessed, obtained, or viewed, including electronically accessed materials." *Id.*

Sessa was released from the Bureau of Prisons on January 10, 2019. *See Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/ (search by BOP Register Number 54240-037) (last accessed June 3, 2025). His supervision began on that date. ECF 4 at 2; ECF 33 at 1. Jurisdiction was transferred to the District of Maryland on February 7, 2019. ECF 2.

On February 12, 2019, USPO filed a "Request for Modifying the Conditions or Term of Supervision with Consent of the Offender." ECF 3. Probation sought to add three additional conditions, *id.* at 1: (1) "You must allow the probation officer to install computer monitoring software on any computer . . . you use"; (2) "To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers . . . subject to computer monitoring"; and (3) "You must participate in a mental health treatment program and follow the rules and regulations of that program." Sessa consented to the requested modification and specifically requested "a referral to a contracted mental health treatment provider to continue to address his mental health needs." *Id.* at 2. I granted USPO's modification request. ECF 4.

During the course of supervision, USPO has apparently required Sessa to submit to periodic polygraph examinations. ECF 9 at 1; ECF 33 at 2. According to defense counsel, ECF 33 at 2: "[Sessa's] polygraphs have always been initiated and ordered by Probation, and performed by a third-party company that contracts with Probation (the Maryland Institute of Criminal Justice), *not* his treatment provider." (Emphasis in ECF 33).

Defendant has been gainfully employed almost the entire time that he has been on supervised release. *See* ECF 33-3 (Sessa's resume). From October 2018 to January 2019, Sessa worked as a warehouse associate, loading and unloading trucks, operating a forklift, and processing metal for recycling. *Id.* at 1. From March 2019 to February "2021,"[4] Sessa worked in building maintenance, performing electrical, plumbing, and drywall work, among other things. *Id.* Then, from February 2022 to June 2023, Sessa worked as a retail sales associate at Dollar Tree, manning the cash register, unloading trucks, and greeting customers. *Id.* From July 2023 through the present, Sessa has worked at an automative yard. *Id.* Moreover, Sessa lives with and cares for his elderly and ailing mother. *See* ECF 37-1 at 1; *see also* ECF 33 at 12; ECF 33-4 at 3.

While on supervised release, defendant has successfully completed substance abuse and mental health treatment programs. ECF 47 at 13–14. Although USPO no longer requires Sessa to remain in those programs, defendant continues to participate, and at his own expense. *Id.* at 14.

Beginning in 2019, per the terms of his supervised release, Louisiana Case, ECF 47 at 4, Sessa enrolled in sex offender treatment in Maryland at Huber and Associates. ECF 5; *see also* ECF 47 at 15. In or around January 2022, "in response to failing polygraph evaluations," discussed *infra*, Sessa was referred by his probation agent to Anne Arundel Counseling for a "Sex Offender Specific Evaluation." ECF 37-1 (Anne Arundel Counseling Psychosexual Evaluation Report of February 3, 2022), at 2. Post-evaluation, Erin Stephens, LCPC, CCTP, a "Clinical/Forensic Psychotherapist" at Anne Arundel Counseling, issued a report. ECF 37-1. It states, in part, *id.* at 5: "When asked about the nature of his sexual offense, [Sessa] identified he was falsely convicted

---

[4] It appears that Sessa's resume mistakenly states February "202**1**" instead of February 202**2**. *See* ECF 33 at 10 (emphasis added).

of the sexual offense.  He described having a disagreement with his roommate at the time of the arrest and his roommate planted the child pornography to seem in his possession."

Further, the report states, *id.*:

> [Sessa] addressed the recent concern from his probation office with failing his polygraph examinations.  He identified one of the concerns from his probation officer was obtaining a flip phone with web access that was not able to have monitoring software installed.  He also reported using his mother's tablet which is not monitored.  He states concerns came from the polygraph evaluation listing unregistered devices and contact with minors as concerns.  He reported his next polygraph on February 10.  He also reported his probation officer stated concern with watching men's diving competition in the Olympics and looking at profile pictures of young men and minors.

In addition, the report indicates that, based on two risk assessment tools "and the additional information within the psychosexual evaluation content," Sessa "is at a low to moderate risk level of sexual recidivism."  *Id.* at 7.

Stephens recommended that Sessa participate in bi-weekly individual and group sex offender treatment.  *Id.* at 9.  She also recommended, *id.* at 10: "Complete periodic supervisory polygraph examinations to increase accountability and compliance with probation and treatment conditions."  Thereafter, Sessa began biweekly sex offender treatment at Anne Arundel Counseling.  He participated in both individual and group sessions.  And, as noted, he currently continues in treatment.

The treatment providers at Anne Arundel Counseling issue both monthly and quarterly treatment reports.  *See* ECF 33-4 at 1–65 (monthly and quarterly treatment reports for Sessa from January 2022 through February 2024); ECF 47-2 at 1–17 (monthly and quarterly treatment reports for Sessa from April 2024 through October 2024).[5]  Between January 2022 and October 2024,

---

[5] It appears that the Court has not been provided with Sessa's treatment records from March 2024.  Nonetheless, neither USPO nor the government has pointed to any issues with Sessa's behavior during treatment in March 2024.

defendant missed just a handful of sessions.  *See* ECF 33-4 at 7 (missed session on March 1, 2022);[6] ECF 33-4 at 21 (missed session on September 27, 2022, "due to medical issue"); ECF 33-4 at 32 (missed session on January 25, 2023; Sessa "reported being sick and not being able to make session."); ECF 33-4 at 34 (missed session on February 1, 2023, but the report states: "Client excused, work related"); ECF 33-4 at 39 (missed session on April 12, 2023; report states that Sessa missed "due to reported meeting with" his probation officer).

Moreover, during the same time period, January 2022 through October 2024, every monthly report indicates that Sessa "met" the treatment goals addressed that month; Sessa's behavior and commitment to treatment were "positive"; and his overall progress was "acceptable" (the two options being "acceptable" or "unacceptable").  I highlight a few comments from Sessa's monthly treatment reports:

- January 2022: Sessa "endorsed motivation for treatment" and "attended sessions on time and was active and engaged."  ECF 33-4 at 2.

- February 2022: "Client is engaged and active during sessions and exhibits appropriate desire to meet treatment goals."  *Id.* at 4.

- July 2022: "Client is engaged and active during sessions and exhibits appropriate insight, judgment, and desire to meet treatment goals."  *Id.* at 18.

- September 2022: Sessa was in "compliance with all treatment expectations" and "no issues to report with this client."  *Id.* at 22.

- November 2022: "Mr. Sessa is doing well."  *Id.* at 27.

---

[6] Defendant's March 2022 Monthly Treatment Report indicates that he failed to appear on March 1, 2022, ECF 33-4 at 7.  But, Sessa's Quarterly Treatment Report for that time period states, *id.* at 8: "Client attended all scheduled appointments and cooperated fully."

- January 2023: "Mr. Sessa has done well in treatment.  The writer sees continuous progress as the months go by."  *Id.* at 31.

- February 2023: "Client endorsed engagement during victim empathy discussion. . . . Client appeared open to process elements related to victim empathy."  *Id.* at 33.

- March 2023: "Mr. Sessa continues to do well in treatment.  He has come a long way since writer first met him, especially with his anger issues and impatience."  *Id.* at 36.

- June 2023: "Client appeared to be engaged in therapeutic dialogue.  Client seemed to be transparent in therapeutic dialogue."  *Id.* at 42.  It also states, *id.* at 43: "The writer has been pleased with [Sessa's] growth as compared to his early days in group sessions."

- September 2023: "Mr. Sessa is doing very well in group."  *Id.* at 50.

- January 2024: "Mr. Sessa does well while in sessions."  *Id.* at 62.  It also states: "In compliance with all treatment expectations."  *Id.*

- April 2024: "Mr. Sessa continues to do well. . . .  No issues to report."  ECF 47-2 at 1.

- October 2024: "In compliance with all treatment expectations."  *Id.* at 15.

In a "Monthly Treatment Report" of September 30, 2023 (ECF 33-1), Kathryn Chumney, MS, LGPC, NCC, one of Sessa's treatment providers at Anne Arundel Counseling, purportedly stated, *id.* at 1: "I believe polygraphs can be used to maintain reduced risk factors and for accountability for Mr. Sessa.  While Mr. Sessa continues to do very well in treatment, has a stable and healthy work environment, and is in a good place that does not mitigate the realistic aspects of his triggers and interests related to his sexual offense."  As I discuss in more detail, *infra*, there is a dispute as to the authenticity of this recommendation.

On December 31, 2023, defendant's individual sex offender treatment provider recommended reducing defendant's individual sessions from biweekly to monthly. ECF 33-4 at 59. Then, on February 1, 2024, defendant's group session treatment provider recommended a reduction of defendant's group sessions from weekly to biweekly. *Id.* at 62.

Notably, on April 30, 2024, Chumney recommended defendant for "[d]ischarge" from his individual sex offender treatment sessions, "due to success in treatment." ECF 47-2 (Monthly Treatment Report, 4/30/24), at 2. Reports for subsequent months made the same recommendation. *See* ECF 47-2 at 3 (May 2024); ECF 47-2 at 5 (June 2024); ECF 47-2 at 8 (July 2024); ECF 47-2 at 10 (August 2024); ECF 47-2 at 12 (September 2024). And, a Quarterly Treatment Report of October 1, 2024, pertaining to the period of July 1, 2024, through September 30, 2024, signed by Charles J. Walsh, CADC, CSOTP, states, ECF 47-2 at 13: "Both the individual and group therapist are recommending successful termination beginning on November/2024."[7] Nonetheless, Sessa apparently remains in treatment because USPO will "not agree to terminate him until this Court decides the polygraph issue." ECF 47 at 15.

Sessa's supervision has not been without incident, however. On July 24, 2020, USPO submitted a "Report on Offender Under Supervision," summarizing two alleged violations. ECF 5. Violation Number 1 is as follows, *id.* at 1:

> Mr. Sessa is currently receiving sex offender specific treatment at Huber and Associates. He is required to attend a group session once per week. In the past 8 months he has missed 12 group sessions, specifically on November 26, 2019; December 24, 2019; December 31, 2019; February 4, 2020; February 11, 2020; March 31, 2020; April 14, 2020; April 28, 2020 and June 16, 2020. He has been reprimanded verbally, and his condition for sex offender treatment has been reviewed with him. On most occasions when Sessa missed a group session, he stated that he simply forgot to go or log onto the Zoom session.

---

[7] "CADC" is apparently an abbreviation for "Certified Alcohol and Drug Counselor." "CSOTP" appears to stand for "Certified Sex Offender Treatment Provider."

Violation Number 2 states: "On December 18, 2019, Sessa admitted during the polygraph that he viewed pornography 5-6 times on his mother's computer and a work phone." *Id.* The violation summary also states, *id.*: "He is aware that he is not to view pornographic material per his additional conditions of release."

Of relevance, the probation agent recommended "no action at this time." *Id.* at 2. But, she stated that "if this behavior persists," USPO "will ask for court action." *Id.*

On April 6, 2022, USPO filed another "Report on Offender Under Supervision." ECF 7. It contains one alleged violation, but in actuality it consists of two alleged infractions, as follows, *id.* at 1:

> On January 10, 2022 this officer discovered during a routine computer monitoring review that Mr. Sessa was viewing images and videos depicting teenage and pre-teen minor males on his monitored cell phone. This officer discussed with Mr. Sessa that this was inappropriate and high-risk behavior. He was warned that if it continued, his internet will be restricted.

> On April 4, 2022 this officer discovered during routine computer monitoring review that Mr. Sessa was viewing similar material on April 3, 2022. In response, this officer restricted his internet for 30 days and notified his sex offender treatment provider. This officer also spoke with Mr. Sessa about using the internet in an appropriate fashion and was encouraged to discuss this topic in sex offender therapy.

Further, the report states that, "[i]n response to the above noncompliance," the probation officer "restricted [Sessa's] internet for 30 days and notified his sex offender treatment provider." *Id.* at 2. The probation officer "also admonished Mr. Sessa and discussed him using the internet in an appropriate fashion and [he] was encouraged to discuss this topic in sex offender therapy." *Id.* Nevertheless, the probation officer said, *id.*: "No action is requested at that time."

On April 30, 2025, USPO submitted another status report. ECF 53. It lists two alleged violations. Violation number one alleges that on April 26, 2025, defendant was issued several traffic citations: "Owner Failure to Apply to Adm. For Reg. of Veh. Subject to Reg."; "Knowingly

Driving Uninsured Vehicle"; "Owner Failure to Apply for Title Cert. for Instate Veh."; "Attaching

Unauthorized Veh. Reg. Plate With Intent to Conceal, Misrepresent Veh. ID"; and "Unauthorized

Display and Use of Registration Plate." *Id.* at 1. Violation number two alleges that defendant

failed to advise his probation officer of the citations within 72 hours. *Id.* at 1–2. The probation

officer "reminded" Sessa "of his obligation to report law enforcement contact within 72 hours."

*Id.* at 2. Sessa advised that "he was unaware of the requirement . . . ." *Id.* Nonetheless, the

probation officer requested "no action." *Id.*

At issue here, on August 7, 2023, USPO filed "Request for Modifying the Conditions or

Term of Supervision with Consent of the Offender." ECF 9. As noted, USPO sought to modify

conditions of supervision to add the following, *id.* at 1: "You must submit to periodic polygraph

testing at the discretion of the probation officer as a means to ensure that you are in compliance

with the requirements of your supervision or treatment program."

Under the heading of "Cause", ECF 9 states, in part, *id.*:

Mr. Sessa has been participating in sex offender treatment since the beginning of
supervision. He is currently enrolled at Anne Arundel Counseling and is attending
both individual and group therapy. It should also be noted that he has participated
in various polygraph testing to ensure compliance with his supervision and also his
treatment plan since his release.

As the court is aware, there have been some changes to condition language over the
years and the U.S. Probation Office would like to update the language in Mr.
Sessa's judgment and also give him credit for his participation in sex offender
treatment, which also includes participation in polygraph testing. His current
judgment does not specifically state he is required to participate in polygraph
testing.

On July 25, 2023, the proposed modifications were discussed with Mr. Sessa. He
agreed to the modifications and signed the attached PROB 49 document.

The Petition (ECF 9) indicates that the Office of the U.S. Attorney was advised of the

requested modification on July 25, 2023, and expressed no objection. *Id.* at 2. And, it states that

defense counsel was advised of the proposed modification on July 26, 2023, but, as of August 7,

2023, no response was received.  *Id*.  A Waiver of Hearing form signed by Jessica Turro, Sessa's probation officer, and Sessa was appended to the Petition.  *See* ECF 9-1.  Given Mr. Sessa's consent, and the failure of defense counsel to respond to USPO after almost two weeks, I approved the Petition on August 7, 2023.  ECF 10.

On August 10, 2023, Sessa, through counsel, filed a "Motion to Set Hearing to Modify Conditions."  ECF 11.[8]  Counsel acknowledged that Sessa "previously consented to the [polygraph] condition," but she explained that his consent was given "before he had the opportunity to consult an attorney."  *Id.* ¶ 9.  Therefore, defendant "formally object[ed] to addition of the polygraph condition, and request[ed] this Court set a modification hearing."  *Id.* ¶ 10.

On August 15, 2023, the Court scheduled a hearing on modification of supervised release for September 14, 2023.  ECF 16.  At the request of defense counsel, however, the hearing was rescheduled to October 27, 2023.  ECF 20.  Following a telephone conference on October 20, 2023 (ECF 22), the modification hearing was rescheduled to November 29, 2023.  ECF 24.  At the request of the parties, the hearing was rescheduled several more times.  *See* ECF 25; ECF 26; ECF 27; ECF 28; ECF 29; ECF 30.

On April 5, 2024, Sessa filed a "Motion to Reject Modification of Supervision."  ECF 33.  He appended numerous monthly and quarterly treatment reports (ECF 33-1; ECF 33-2; ECF 33-4) and his resume (ECF 33-3).  The Court held a hearing that day.  ECF 34.[9]  It resumed on April 10, 2024.  ECF 35; ECF 36.  The government and the defendant each submitted exhibits. *See* ECF 37; ECF 38.

---

[8] The Office of the Federal Public Defender was appointed on August 10, 2023.  ECF 14. However, AFPD Wong was specifically referenced by USPO Turro as the lawyer to whom notice was sent on July 26, 2023.

[9] No transcript has been docketed.  Therefore, I have relied on my notes from the hearing.

On April 18, 2024, defense counsel sent an email to Chambers, notifying the Court that Judge Deborah Boardman was considering a similar issue in the case of *United States v. Gaskin*, 14-cr-37-DLB. ECF 39. Defense counsel asked this Court to stay its ruling pending disposition by Judge Boardman. *Id.* at 1. Defense counsel also advised that at least one other judge in this District had agreed to defer ruling for the same reason. *Id.* I agreed to await Judge Boardman's ruling. *See* ECF 40.

On September 6, 2024, the Court wrote to defense counsel and requested a status report. ECF 40. Defense counsel responded on September 18, 2024. ECF 41. She advised that Judge Boardman had not yet ruled, and that defense counsel would update this Court as soon as Judge Boardman ruled. *Id.* at 1.

On January 17, 2025, defense counsel emailed Chambers to notify the Court of Judge Boardman's ruling in *Gaskin* on December 12, 2024. ECF 42; *see also Gaskin*, 14-cr-037-DLB, ECF 62; *United States v. Gaskin*, 759 F. Supp. 3d 633 (D. Md. 2024). Defense counsel also asked for permission to file a "brief supplemental memo in light of" *Gaskin*. *Id.* I approved the request on January 17, 2025. *Id.*

Sessa filed a "Supplemental Briefing to Reject Modification of Supervision" on March 2, 2025. ECF 47. Sessa submitted, *inter alia*, monthly and quarterly treatment reports, discussed earlier. ECF 47-2. The government filed its Opposition on March 4, 2025. ECF 48. Defendant replied on March 24, 2025. ECF 50.

A third hearing on the modification of supervised release was scheduled for May 21, 2025. ECF 51.[10] However, it was rescheduled to June 9, 2025. ECF 52. In the interim, by letter of June

---

[10] The Docket incorrectly shows that the hearing concerned a violation of supervised release. ECF 51; ECF 52.

3, 2025 (ECF 55), I inquired as to the necessity of another hearing.  In response, the attorneys agreed that another hearing was unnecessary.  ECF 57.

## II.  Legal Standard

Supervised release "is a unique method of post-confinement supervision."  *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991); *see United States v. Buchanan*, 638 F.3d 448, 451 (4th Cir. 2011).  It "fulfills rehabilitative ends, distinct from those served by incarceration."  *United States v. Johnson*, 529 U.S. 53, 59 (2000); *see United States v. Lewis*, 90 F.4th 288, 294 (4th Cir. 2024) (stating that "while punishment is a legitimate reason for imposing imprisonment, it is not an appropriate reason for imposing supervised release, which is intended for rehabilitation."), *cert. denied*, ___ U.S. ___, 144 S. Ct. 2543 (2024); *United States v. Ellis*, 984 F.3d 1092, 1100 (4th Cir. 2021) ("Punishment is not an acceptable basis for release conditions.").

The "'primary goal'" of supervised release "'is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release.'"  *Lewis*, 90 F.4th at 294 (quoting S. Rep. No. 98-225, at 124 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3307).  Thus, supervised release is "a post-incarceration program intended 'to assist individuals in their transition to community life.'"  *United States v. McLeod*, 972 F.3d 637, 641 (4th Cir. 2020) (quoting *Johnson*, 529 U.S. at 59).

In *United States v. Hamilton*, 986 F.3d 413, 416–17 (4th Cir. 2021), the Fourth Circuit reviewed the origin of the supervised release system.  Recognizing that the system of supervised release "serves several purposes . . .", *id.* at 418, the *Hamilton* Court said, *id.*:  "Key among these are protection of the public, *see id.* § 3553(a)(2)(C), and rehabilitation of the defendant, *see id.* §

14

3553(a)(2)(D)." As the Court put it, supervised release "represents an act of faith that conditions less than full-scale incarceration will reduce recidivism and repetition of the misconduct that landed the defendant in jail in the first place." *Id.* But, the Court admonished, "This faith must not be blind." *Id.*

A defendant who is on supervised release must abide by certain mandatory, standard, and discretionary terms and conditions. *See* 18 U.S.C. § 3583(d); *see also Buchanan*, 638 F.3d at 451; *United States v. Maxwell*, 285 F.3d 336, 342 (4th Cir. 2002). Section 3583(e) of 18 U.S.C. governs a district court's authority to revoke, extend, modify, or terminate a defendant's term of supervised release.

As indicated, certain conditions of supervised release are mandatory. *See* 18 U.S.C. § 3583(d); *see also United States v. Rogers*, 961 F.3d 291, 296 (4th Cir. 2020) (stating that "§ 3583(d)'s mandatory conditions are, necessarily, part of any term of supervised release pronounced at sentencing"). Mandatory conditions include, for example, that "the defendant not commit another Federal, State, or local crime during the term of supervision . . . ." 18 U.S.C. § 3583(d). Other terms of supervised release are discretionary. "Certain discretionary conditions are called 'standard' conditions, U.S.S.G. § 5D1.3(c), and others are called 'special' conditions, *id.* § 5D1.3(d)–(e)." *Gaskin*, 759 F. Supp. 3d at 640 n.8. The condition at issue here is a discretionary special condition. *See id.*

"When a sentencing court considers whether to impose a term of supervised release, and the duration and conditions of that release, § 3583(c) instructs the court to employ a slightly modified version of the general 'framework for sentencing decisions' established by § 3553(a)." *McLeod*, 972 F.3d at 641 (citation omitted). Section 3583(c) of 18 U.S.C. states: "The court, in determining whether to include a term of supervised release, and, if a term of supervised release is

to be included, in determining the length of the term and the conditions of supervised release, shall consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)."

Under 18 U.S.C. § 3583(d), courts may impose a discretionary condition of supervised release, provided that such condition: "(1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)[.]" 18 U.S.C. §§ 3583(d)(1)–(3); *see also United States v. Castellano*, 60 F.4th 217, 225 (4th Cir. 2023) (discretionary conditions of supervised release "must (1) be 'reasonably related' to the nature and circumstances of the offense, the history and characteristics of the defendant, and the statutory goals of deterrence, protection of the public, and rehabilitation; (2) involve 'no greater deprivation of liberty than is reasonably necessary' to achieve those purposes; and (3) accord with any pertinent Sentencing Commission policy statements.") (quoting 18 U.S.C. § 3583(d)); *Ellis*, 112 F. 4th at 252 (same); *United States v. Dotson*, 32 F.3d 256, 260–61 (4th Cir. 2003) (same).

Specifically, the applicable factors are "the nature and circumstances of the offenses and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); providing adequate deterrence, *see* § 3553(a)(2)(B); protecting the public from further crimes of the defendant, *see* § 3553(a)(2)(C); and providing the defendant with training, medical care, or treatment, *see* § 3553(a)(2)(D).

Fed. R. Crim. P. 32.1(c)(1) governs modification of the conditions of supervised release. It states, in part: "Before modifying the conditions of . . . supervised release, the court must hold

a hearing, at which the person has the right to counsel and an opportunity to make a statement and present any information in mitigation."[11]  *See also Gaskin*, 759 F. Supp. 3d at 641 n.9.  There are exceptions.  *See* Fed. R. Crim. P. 32.1(c)(2).  Notably, the burden is on the party seeking the modification to produce evidence supporting the discretionary condition it seeks to impose.  *See Ellis*, 984 F.3d at 1100 n.6.

"When a district court considers whether to modify or revoke a condition of supervised release, § 3583(e) authorizes the court to consider the same § 3553(a) factors enumerated in § 3583(c)."  *McLeod*, 972 F.3d at 641; *see also* 18 U.S.C. § 3583(e)(2) ("The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)-- . . . modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation and the provisions applicable to the initial setting of the terms and conditions of post-release supervision").  The *McLeod* Court has said, 972 F.3d at 641:  "The invocation of these capacious factors in both subsections (c) and (e) signals that Congress intended to give district courts broad authority to impose, modify, and revoke conditions of supervised release, as necessary, tailored to the specific and individual circumstances of each defendant."  *See also Dotson*, 32 F.3d at 260 ("District courts have broad latitude to impose conditions on supervised release.").

As the Fourth Circuit has observed, "requiring polygraphs as a condition of supervised release is routinely done."  *United States v. Smith*, 2023 WL 3051815, at *2 (4th Cir. Apr. 24,

---

[11] On June 23, 2025 (ECF 58), the Court wrote to counsel and inquired as to whether, in the view of counsel, the hearing of April 5, 2024 (ECF 34) and/or April 10, 2024 (ECF 36) satisfied the requirements of Fed. R. Crim. P. 32.1(c)(1) with respect to defendant's "opportunity to make a statement . . . ."  By email of June 25, 2025 (ECF 59), defense counsel advised: "Mr. Sessa will waive his right to 'make a statement' under Rule 32 and does not desire an additional hearing."

2023) (citing cases from numerous circuits).  Nevertheless, it is well settled that a discretionary condition cannot be imposed without an "'individualized assessment of the defendant and the [statutory] factors.'"  *Rogers*, 961 F.3d at 297 (quoting *United States v. Wroblewski*, 781 F. App'x 158, 162 (4th Cir. 2019) (per curiam)) (alteration in *Rogers*); *see also, e.g.*, *United States v. Van Donk*, 961 F.3d 314, 322 (4th Cir. 2020) ("A sentencing court must provide an individualized explanation for why any special conditions it imposes are appropriate in light of the § 3583(d) factors."); *United States v. McMiller*, 954 F.3d 670, 677–78 (4th Cir. 2020) ("'[S]pecial conditions must be tailored to the individual defendant and may not be based on boilerplate conditions imposed as a matter of course in a particular district.'") (quoting *United States v. Caravayo*, 809 F.3d 269, 276 (5th Cir. 2015)) (alteration in *McMiller*).

Moreover, "'a court may not categorically impose [a particular] condition in every child pornography case that comes before it; since the relevant statutory and constitutional considerations look to whether the condition is more restrictive than what is needed to satisfy the governmental interest in a specific case, the district court must decide whether to impose such a condition based on specific facts.'"  *Wroblewski*, 781 F. App'x at 162–63 (quoting *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006)) (alterations in *Wroblewski*).  In *Wroblewski*, 781 F. App'x at 162–63, the Court vacated a condition barring the defendant from possession of sexually explicit materials because the district court's only explanation for the condition was that it is "a standard condition for sex offenders" and "necessary and appropriate under the circumstances."  *See also United States v. Henderson*, 64 F.4th 111, 122 (3d Cir. 2023) ("caution[ing]" that "polygraph testing is not appropriate across the board"); *United States v. Sanchez*, 44 F.4th 1100, 1105 (8th Cir. 2022) ("Polygraph testing, like other special conditions of supervised release, cannot be routinely imposed on all sex offenders.  [Instead], it must be warranted by an

individualized inquiry into a particular offender's circumstances."); *United States v. Warren*, 843 F.3d 275, 284 (7th Cir. 2016) ("[D]etermining whether a polygraph condition is appropriate (*e.g.*, with respect to the extent to which it ought to be (1) tied to treatment and (2) under the purview of the treatment provider versus the probation office) depends on the facts of each case.").

Indeed, even where a discretionary condition "may seem intuitive or commonsense to some, it must be supported by individualized evidence to meet § 3583(d)'s reasonably related standard." *Ellis*, 984 F.3d at 1100. Although district courts have "'broad latitude'" to impose special conditions of supervision, *Van Donk*, 961 F.3d at 321 (citation omitted), "[i]mposing special conditions that fail to comply with § 3583(d) is an abuse of discretion and grounds for vacating the conditions." *Ellis*, 984 F.3d at 1098. Nonetheless, "[t]he amount of explanation required 'will vary with the nature of the condition imposed and the circumstances of each case.'" *Van Donk*, 961 F.3d at 32 (quoting *McMiller*, 954 F.3d at 677).

### III.  The Contentions

Sessa argues that "Probation's proposed polygraph condition is not 'reasonably related' to the § 3583(d)(1) factors." ECF 47 at 11 (boldface omitted). Recognizing that a special condition of supervised release "must be supported by 'individualized evidence' that the conditions are 'necessary and appropriate' under the circumstances," *id.* at 17 (citation omitted), Sessa complains, *id.* at 12: "Probation has not provided evidence specific to Mr. Sessa that justif[ies] polygraphing outside of treatment." Moreover, he argues that USPO's request "contained no reasoning" as to why the polygraph condition is "necessary here." ECF 33 at 18.

Defendant observes that, at the time he filed the Motion in April 2024, the FPD was "dealing with [an] influx of modification requests from Probation that propose the same freestanding polygraph condition for numerous individuals on supervision . . . ." *Id.* at 19. Thus,

19

defendant suggests: "Probation sought its proposed modification solely because of a blanket office policy to request polygraph testing in every sex offense case, no matter the circumstances." ECF 47 at 1.

Sessa also raises concerns regarding the legitimacy of the recommendation of Kathryn Chumney, a treatment provider at Anne Arundel Counseling. ECF 33 at 5–8. Specifically, defendant claims that the document sent to defense counsel from USPO (ECF 33-1) differs from the document defendant received in discovery from the treatment provider (ECF 33-2). Although both documents are purported copies of the September 2023 Report, the former features the polygraph recommendation, while the latter does not. ECF 33 at 7. Moreover, defendant included in his Motion a screenshot showing that the document was last edited by Jessica Turro of USPO, not Chumney. *Id.* Defendant states, *id.*: "The comparison of these two September 2023 monthly evaluation reports leads to one conclusion only: the treatment provider's 'recommendation' for polygraphing was, at best, induced by Probation."

In any event, defendant highlights his rehabilitation efforts and positive performance in treatment sessions and while on supervised release. He states, ECF 47 at 12–13 (emphasis in ECF 47): "Mr. Sessa, *prior* to participating in sex offender treatment in 2019, was deemed the lowest possible risk of reoffending, and he has diligently participated in sex offender treatment for 6 years, holds a full-time job, successfully completed mental health and substance abuse treatment – and yet still continues attending treatment, and has complied with the other conditions of supervision for the past 6 years." Further, Sessa posits, *id.* at 13: "Save for a one-month period when he was transitioning from the RRC to supervision, Mr. Sessa has been continuously employed full-time since he was released from prison over 6 years ago." Sessa also states that he "overcame a drug addiction while on supervision." *Id.* And, defendant argues that he "has not had a single positive

urinalysis test since he began supervision." *Id.* at 14.  He also points out that he voluntarily continued substance abuse and mental health treatment after USPO no longer required it, and he pays out of his own pocket.  *Id.*

Further, Sessa maintains that, "most importantly," since January 2019 "he has participated in sex offender treatment pursuant to his required conditions of supervision." *Id.* at 15.  Defendant points to his "overwhelmingly positive" evaluations from both his "group and individual treatment providers over the past three years . . . ." *Id.* at 16.  He adds that he was recommended for discharge from the program in November 2024 due to "success in treatment," but that he remains in treatment because Probation will not agree to terminate him until the Court resolves the polygraph issue.  *Id.* at 15.

Yet, Sessa acknowledges that he "has not been 100% perfect on supervision . . . ." *Id.* at 16.  But, he points out that the two instances where he "allegedly engaged in 'noncompliant' behavior" occurred in July 2020 and April 2022, respectively, and Probation deemed Sessa's noncompliance "minor enough that it could be addressed through internal supervision sanctions, and submitted No-Action Status Reports to this Court instead.[]" *Id.* (citing ECF 5, report of 7/24/20; ECF 7, report of 4/6/22).  He also maintains that "these incidents have already been addressed successfully in treatment, and his compliance *has* been perfect over the past 3 years." ECF 47 at 16 (emphasis in ECF 47).  Defendant adds, *id.* at 16–17: "Mr. Sessa would not have been recommended for successful discharge from treatment had his providers – who know about these incidents in greater detail than Probation, given that Mr. Sessa addressed them head-on in treatment – not felt confident that Mr. Sessa was not a risk of reoffending."

In sum, as to the requirements of 18 U.S.C. § 3583(d)(1), Sessa states, *id.* at 17.: "Here, Probation has not provided specific evidence with regards to Mr. Sessa that meets the statutory

requirements of § 3583(d)(1) – Probation has only provided their own generalized statement and the treatment provider's generalized statement about the usefulness of polygraphing when it comes to people convicted of sex offenses in general.[ ]"  Defendant adds, *id.*: "[T]aking these generalized statements against the backdrop of Mr. Sessa's success on supervision, there has been no individualized determination made regarding Mr. Sessa, and there is no evidence showing that the polygraph condition is reasonably related to the § 3583(d)(1) factors."

Turning to the requirements of 18 U.S.C. § 3583(d)(2), defendant argues that imposing the polygraph condition would subject him to "'a greater deprivation of liberty than is reasonably necessary.'"  ECF 33 at 23 (quoting 18 U.S.C. § 3583(d)(2)).  According to Sessa, USPO "has many other tools of supervision at its disposal . . . which include serious deprivations of liberty such as computer monitoring, prohibitions on contact with minors and legal adult porn, and sex offender treatment until Probation pulls the plug on it."  ECF 33 at 23.  In defendant's view, these tools "have been effective at ensuring Mr. Sessa does not reoffend."  *Id.*

In opposing the Petition, Sessa complains that polygraphs are "not just embarrassing, shameful, and intrusive; their results are or dubious reliability to begin with . . . ."  *Id.* at 20.  Indeed, defendant posits, *id.* at 21: "There is almost no other condition that involves a 'greater deprivation of liberty' than the thought-policing that is polygraphing outside of treatment."  (Citation omitted).  Defendant also raises concerns with the lack of a limitation on the frequency of the polygraphs or the topics that may be covered, and asserts that the condition, as proposed by USPO, would remain in effect for the entirety of Sessa's supervised release, notwithstanding any progress he may make.  ECF 47 at 18.[12]

---

[12] This assertion is inaccurate and unfounded.  As this case illustrates, USPO can seek to modify conditions of supervised release, including by removing conditions.  And, both USPO and a defendant may seek early termination of supervised release.

As noted, the government supports Probation's request. ECF 48 at 1. The government posits that it makes "an individualized and independent assessment of all proposed conditions of supervision and does not automatically adopt Probation's position in every instance where a modification is sought." *Id.* at 2. Instead, the government claims that it considers a "broad range of factors," including "criminal history, the underlying offense conduct, compliance with the conditions of supervision, and a defendant's truthfulness about both his offense and conduct during supervision.[]" *Id.*

The government then explains that it supports Probation's request because Sessa's "supervision thus far involved a number of concerning incidents." *Id.* at 3. It states, *id.*:

> When reporting for a psychosexual evaluation in January 2022, the Defendant indicated "he was falsely convicted of [his] offense," and that "his roommate planted the child pornography." (ECF No. 37-1, pg. 5). The Defendant further noted he had failed a previous polygraph. *Id.* In a December 2019 polygraph, the Defendant admitted to viewing pornography five or six times on his mother's computer and a work phone, the Defendant having been fully aware such conduct was expressly prohibited by his conditions of supervision. (ECF No. 37-3, pg. 1). Then, in January 2022, the Defendant was caught viewing images and videos of minor male children on his monitored cell phone.[] (ECF No. 37-4, pg. 1). In April 2022, the Defendant was yet again observed viewing similar material of young men and minor boys during a routine computer monitoring review. (ECF No. 37-4, pg. 1).

Further, the government observes, *id.* at 1: "Polygraphs are intended to encourage honesty with a probation officer and help determine whether additional therapeutic intervention is needed." (Citing cases). Moreover, the government asserts, *id.* at 2: "The Fourth Circuit and other circuits . . . have routinely upheld polygraphs as a condition of a sex offender's supervision when merited by an *individualized* assessment of the defendant." (Emphasis in ECF 48). The government also points to defendant's September 2023 monthly sex offender treatment report, which it characterizes as a "specific polygraph recommendation from the Defendant's treatment provider."

23

*Id.* at 4.  But, the government does not address defendant's contention concerning the legitimacy of Chumney's recommendation in its brief.  *See* ECF 48.

In sum, the government argues, *id.* at 4–5: "Given the seriousness of the Defendant's underlying offense, his past refusal to take responsibility for that offense, his viewing pornography and images of minor children while on supervision, and his treatment provider's specific polygraph recommendation, the government continues to support Probation's request for the modification of the Defendant's conditions of supervised release to include polygraph examinations."

In Reply, Sessa underscores that his "alleged denial that he committed the instant offense was made to a clinician at Anne Arundel Counseling over 3 years ago, during the course of an initial intake evaluation prior to him even beginning sex offense treatment there.[]"  ECF 50 at 1. Further, Sessa argues that the treatment provider "appears" to recommend polygraphs "*during the course of treatment* – a tool Mr. Sessa has no objection to."  *Id.* at 2 (emphasis in ECF 50).  He states, *id.*: "Rather, Mr. Sessa objects to polygraph testing outside the treatment setting and at the discretion of a probation officer for his entire 15-year term of supervised release."  He also asserts, ECF 33 at 23: "There is a distinction between polygraphs being used in the course of treatment and polygraphs being used to determine compliance with supervision."  Defendant maintains that "probation officers are not trained sex offender treatment providers, so probation officers should not be directing polygraphs – and if they are directing polygraphs, that means they are using the results solely for law enforcement purposes."  *Id.* at 22.

Nevertheless, defendant states that, "if this Court does order polygraph testing, it should craft the condition narrowly in order to comply with § 3583(d)."  ECF 50 at 2.  Specifically, Sessa states, *id.* at 2–3: The Court "should: (1) provide that Probation may use polygraph results only to facilitate treatment, and not to 'inculpate' Mr. Sessa through a revocation petition or fresh criminal

investigation; (2) limit questioning to those topics that are directly relevant to Mr. Sessa's supervised-release conditions; (3) order that, at the start of each polygraph exam, Mr. Sessa be informed that his supervised release cannot be revoked based on a valid invocation of his Fifth Amendment privilege against self-incrimination; and (4) limit the number of polygraphs to one per year." (Internal citations omitted).

## IV.  Discussion

### A.  18 U.S.C. § 3583(d)(1)[13]

As noted, pursuant to 18 U.S.C. §§ 3583(d)(1), I must determine whether the proposed polygraph condition is "reasonably related" to the following sentencing factors: "the nature and circumstances of the offenses and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); providing adequate deterrence, *see* § 3553(a)(2)(B); protecting the public from further crimes of the defendant, *see* § 3553(a)(2)(C); and providing the defendant with training, medical care, and/or treatment, *see* § 3553(a)(2)(D).  In conducting this analysis, I am mindful that, even where a discretionary condition "may seem intuitive or commonsense to some, it must be supported by individualized evidence to meet § 3583(d)'s reasonably related standard." *Ellis*, 984 F.3d at 1100.

There is no doubt that defendant's crime is serious.  He does not contend otherwise.  But, since defendant's release from prison in January 2019, he has not been charged with any other crime.

---

[13] Under 18 U.S.C. § 3583(d)(3), a discretionary condition must be "consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)[.]" There is no policy statement that relates to the issues here.  Therefore, like the parties, I focus on the statutory requirements of 18 U.S.C. §§ 3583(d)(1) and (2).

Nevertheless, Probation has submitted three status reports alleging that defendant violated conditions of his supervised release. *See* ECF 5; ECF 7; ECF 53. However, USPO did not seek to pursue charges of violation. *Id.* And, aside from receiving several traffic citations in April 2025, and failing to report those citations to USPO, defendant has been in compliance with the conditions of his supervised release for over three years.

Sessa resides with and helps care for his elderly mother. *See* ECF 37-1 at 1; *see also* ECF 33 at 12; ECF 33-4 at 3. He has been gainfully employed for about seven years. *See* ECF 33-3 (Sessa's Resume). In addition, defendant has successfully completed mental health and substance abuse treatment programs. ECF 47 at 13–14. He has not had a single positive urinalysis test result since his supervision began. Indeed, USPO no longer requires defendant to participate in these treatment programs. Yet, defendant continues to participate and pays the cost. *See* ECF 33 at 11–12.

Of particular relevance, Sessa has participated in sex offender treatment for several years. In 2019, defendant began sex offender treatment at Huber and Associates in Maryland. ECF 5; ECF 47 at 15. Then, in January 2022, defendant began sex offender treatment at Anne Arundel Counseling. *See* ECF 33-4 at 2. From January 2022 through October 2024, each monthly report indicates that defendant "met" the treatment goals addressed that month; Sessa's behavior and commitment to treatment were "positive"; and his overall progress was "acceptable" (the two options being "acceptable" or "unacceptable").

Even before defendant began sex offender treatment at Anne Arundel Counseling, he was deemed a "low to moderate risk level of sexual recidivism." ECF 37-1 (Anne Arundel Counseling Psychosexual Evaluation Report of February 3, 2022), at 7. This was based on two risk assessment tools "and the additional information within the psychosexual evaluation content." *Id.*; *see also*

ECF 33 at 16–17 (Sessa discusses two risk assessments conducted in connection with a psychosexual evaluation completed by Huber and Associates in February 2019; both risk assessment tools indicated that Sessa was a "low risk individual").

Sessa was recommended for discharge from sex offender treatment approximately eight months ago. ECF 47-2 at 13. The Quarterly Treatment Report ending September 30, 2024, signed on October 1, 2024, by Charles Walsh, one of Sessa's treatment providers at Anne Arundel Counseling, states, *id.*: "Both the individual and group therapist are recommending successful termination beginning on November/2024."

That said, and as defendant acknowledges (ECF 47 at 16), he "has not been 100% perfect" throughout his supervision. It is of concern to the Court that, after service of such a lengthy prison sentence, and while defendant was in sex offender treatment, he viewed images of children on multiple occasions. *See* ECF 7. The last incident occurred on April 3, 2022. *Id.*

As to the incidents involving Sessa's viewership of videos and images of young males, the government and the defense paint two different pictures of what occurred. According to Sessa, ECF 33 at 15: "[T]he 2022 No-Action Report alleges 'noncompliance' for viewing Instagram photos and videos that happened to have minor males in them (males at sports events, mall scenes, and a video of someone jumping off a cliff into the ocean) . . . ." The government states, ECF 48 at 3 n.2 (emphasis in ECF 48): "Despite the Defendant's characterization . . . these were in fact images and videos *specifically* of young men and minor children, including those engaged in swimming or diving, who would—presumably—not be fully clothed." In support of its interpretation, the government cites ECF 37-1 at 5 and ECF 37-4 at 1. *See* ECF 48 at 3 n.2.

The Anne Arundel Counseling Psychosexual Evaluation Report of February 3, 2022, states, ECF 37-1 at 5: "[Sessa] also reported his probation officer stated concern with watching

men's diving competition in the Olympics and looking at profile pictures of young men and minors." The Report on Offender under Supervision, dated April 6, 2022, states, in relevant part, ECF 37-4 at 1: "On January 10, 2022 this officer discovered during a routine computer monitoring review that Mr. Sessa was viewing images and videos depicting teenage and pre-teen minor males on his monitored cell phone. . . . On April 4, 2022 this officer discovered during routine computer monitoring review that Mr. Sessa was viewing similar material on April 3, 2022." The reports support the government's version of events.

Moreover, during the hearing of April 5, 2024, the Court was informed that (1) in May 2022 defendant had a catalogue of minor males on his phone; (2) in June 2022, defendant edited photos of minor males; and (3) at some point in or around 2022, Sessa admitted to communicating with a thirteen year old child.[14]

The Psychosexual Evaluation Report of February 3, 2022 (ECF 37-1), is also concerning. Sessa admitted to (1) obtaining a flip phone that had internet access but could not be monitored; (2) using his mother's tablet device, which also is not monitored; and (3) contacting minors. *Id.* at 5. The Psychosexual Evaluation Report also repeatedly indicates that Sessa is attracted to "younger men." *Id.* at 3, 5. But, Sessa denied attraction to anyone under the age of eighteen. *Id.* at 3.

I am mindful that these incidents occurred approximately three years ago, before Sessa successfully completed sex offender treatment. Nevertheless, when defendant viewed images and videos depicting minor males in January 2022, he was not permitted to do so. And, he received a

---

[14] As noted, I have not been provided with a transcript of the modification hearings. I have relied on my notes.

warning from his probation agent in January 2022. ECF 7. Yet, he engaged in the same behavior just four months later, in April 2022. *Id.*

Sessa also viewed adult pornography on five to six occasions in 2019. ECF 5. Such conduct is not illegal. But, it is prohibited by defendant's conditions of supervised release. Louisiana Case, ECF 47 at 4. For some people, viewership of adult pornography is a trigger as to child pornography. *See Smith*, 2023 WL 3051815, at *3 (upholding a polygraph condition because, *inter alia*, the defendant continued to view adult pornography).

I disagree with Sessa's suggestion (ECF 33 at 15) that, because USPO did not request the Court to take action upon USPO's notices of apparent violations (ECF 5; ECF 7), Probation must not have considered his conduct particularly significant. I do not draw that inference. As the government puts it, ECF 48 at 4: "[W]hen viewed in the context of a 15-year term of supervised release – and the disturbing proximity of these actions to the Defendant's underlying offense (adult pornography/other images of minor males vs. child pornography) – these violations remain significantly concerning."

The government also points to defendant's denial of responsibility for his criminal conduct, instead blaming his roommate. ECF 48 at 3. To be sure, that was during a "Sex Offender Specific *Evaluation*" conducted in January 2022. ECF 37-1 (emphasis added). As Sessa points out, this was essentially an intake interview at Anne Arundel Counseling, before Sessa received any treatment there. ECF 50 at 1. But, it is noteworthy that defendant pleaded guilty and served a lengthy sentence. Thus, defendant's initial failure to accept responsibility is, at the very least, surprising. But, since then, defendant has been recommended for discharge from sex offender treatment. And, there is no indication that defendant continues to deny responsibility for his offense. *See* ECF 33-4 at 1–65; ECF 47-2 at 1–17.

I am also aware that Sessa missed twelve group sex offender treatment sessions at Huber and Associates. But, that occurred over five years ago, between November 2019 and June 2020. ECF 5. In contrast, Sessa's more recent records reflect that he regularly attends his sex offender treatment sessions. Between January 2022 and October 2024, defendant missed only a handful of sessions at Anne Arundel Counseling. *See* ECF 33-4 at 7, 21, 32, 34, 39. And, of the five sessions that were missed, four are explainable. *See id.* at 21, 32, 34, 39. Defendant's attendance at Anne Arundel Counseling was never raised as an issue by his treatment providers or USPO.

In *Gaskin*, 759 F. Supp. 3d at 643, Judge Boardman observed that several other circuits have concluded that polygraph testing conditions, "unconnected to treatment and intended to ensure compliance with supervision," comply with 18 U.S.C. § 3583(d). *See, e.g.*, *Sanchez*, 44 F.4th at 1103–04 (Eighth Circuit); *United States v. Pabon*, 819 F.3d 26, 33 (1st Cir. 2016); *Warren*, 843 F.3d at 280, 284–85 (Seventh Circuit). To my knowledge, the only Fourth Circuit case directly on point is the unreported opinion of *Smith*, 2023 WL 3051815.

In *Smith*, the defendant was convicted in 2008 of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). *Id.* at *1. He was sentenced to 51 months of imprisonment, followed by 20 years of supervised release. *Id.* Relevant here, as a condition of supervised release, the defendant was required to participate in "'a program of mental health treatment, including psychosexual testing and treatment, *polygraph* and penile plethysmograph testing, as directed by the Probation Officer.'" *Id.* (emphasis in *Smith*).

The defendant was charged in March 2014 with violating the conditions of his supervised release by "(1) failing to follow the instructions of his probation officer; (2) possessing pornography; (3) violating his sex offender treatment contract; and (4) accessing online computer services." *Id.* Smith was again charged with violating his supervised release in December 2015,

when he failed to comply with his treatment program. *Id.* at *2. The defendant successfully completed his sex offender treatment in February 2020. *Id.*

In March 2021, Smith moved to modify some conditions of his supervised release "in view of changed circumstances," *id.* at *1, namely that "he had completed his sex offender treatment and had a new wife and step-children with whom he wished to reside." *Id.* at *2. Among other things, Smith sought an order that he 'shall not be compelled to undergo a polygraph examination that is not part of sex-offender treatment . . . ." *Id.* The district court denied Smith's request and "extended the requirement that Smith submit to polygraphs . . . in connection with his 'mental health treatment,' to a requirement that he submit to polygraphs that are 'sharply focused on [his] activities and behavior relevant to [his] attempted use or possession of pornography or child pornography.'" *Id.* at *1 (alterations in *Smith*). The district court reasoned, *id.* at *2: "This requirement is necessary given the condition of supervised release that defendant shall not possess pornography of any type. Because the possession and use of pornography and child pornography tend to be clandestine in nature, polygraph examinations are necessary to ensure defendant's compliance with this condition of supervised release." The defendant appealed, arguing that the district court "abused its discretion because 'the modification was not specifically tied to any change in circumstances from the original sentencing.'" *Id.* at *1.

Citing 18 U.S.C. § 3583(e)(2), the Fourth Circuit first determined that the district court had the authority to modify the terms of supervised release. *Id.* at *2. The Court noted that "requiring polygraphs as a condition of supervised release is routinely done." *Id.* (citing cases). And, the Court said that it was "clear" that "the district court had the authority to require polygraphs as a condition of supervised release, so long as the polygraphs furthered relevant § 3553(a) factors . . . ." *Id.* Nevertheless, the Court observed that, under 18 U.S.C. § 3583(d)(1)–(3), "any

condition of supervised release must be 'reasonably related' to specified § 3553(a) factors; must involve 'no greater deprivation of liberty than is reasonably necessary for the purposes' of those sentencing factors; and must be consistent with pertinent policy statements of the Sentencing Guidelines." *Id.*

Moreover, the Court concluded that the district court "acted well within its discretion" in imposing the polygraph condition. *Id.* at 3. It reasoned, *id.*:

> Smith had admitted in his guilty plea to possession of a large number of images of child pornography; he had violated his conditions of supervised release by continuing his involvement with pornography; and he had been charged with failing to comply with sex offender treatment conditions. Moreover, he was proposing to live with his new wife who had two young children. In this overall context, the court well recognized that the possession of child pornography tended to be "clandestine in nature," and therefore, to assure Smith's compliance with the prohibition against the possession and use of child pornography, the court imposed the requirement of polygraph examinations, albeit ones that are to be "sharply focused" on Smith's "attempted use or possession of pornography or child pornography." In entering this order, we find no abuse of discretion.

*Gaskin*, 759 F. Supp. 3d 633, which addressed a similar issue, is also informative. There, the 43-year-old defendant was serving a 15-year period of supervised release for distribution of child pornography. *Id.* at 634. USPO sought to include the identical condition of supervised release that it seeks to impose here. *See id.* at 634–35 (Probation sought to add a requirement that Gaskin "'submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure that [he is] in compliance with the requirements of [his] supervision or treatment program.'") (citation omitted; alterations in *Gaskin*). Unlike in this case, however, the government did not join USPO's request. *Id.* at 635.

At the outset, Judge Boardman recognized that the purpose of the requested condition was "not to allow for the use of polygraph examinations as a sex offender treatment tool," but instead as a means to "'support and encourage an individual's compliance with the requirements of

supervision and/or treatment services.'" *Id.* at 642 (citation omitted).  Citing *Smith*, 2023 WL 3051815, as well as several decisions from other circuits that permitted polygraph testing conditions unconnected to treatment, the *Gaskin* Court said, 759 F. Supp. 3d at 643: "In each of these cases, as in *Smith*, the district court explained why, under the circumstances of the case before it, the polygraph condition satisfied § 3583(d)."

The only evidence offered in support of USPO's request was a letter from Gaskin's therapist that spoke generally to "'the important clinical uses of polygraph examination in sex offender treatment.'" *Id.* at 638.  But, Judge Boardman observed that the "letter never mentions Mr. Gaskin." *Id.* at 648.  Accordingly, she opined, *id.*: "A generic letter from a sex offender treatment provider that explains the clinical uses of polygraphs in sex offender treatment does not justify a condition that requires Mr. Gaskin to submit to polygraphs outside of the treatment setting, at the sole discretion of a probation officer, for the remainder of his supervised release term."

The court found that the proposed condition "does not satisfy § 3583(d)(1)'s requirement that the condition be 'reasonably related' to the nature and circumstances of his offense, his history and characteristics, and the statutory goals of deterrence, protection of the public, and rehabilitation." *Id.* at 647.  Moreover, Judge Boardman observed that, in the "five years that Mr. Gaskin has been under supervision, he has fully complied with the conditions of supervised release." *Id.* at 635.  She also noted that the defendant had not been charged with a new crime or a violation of supervised release, successfully completed sex offender treatment, and "submitted to several polygraph examinations; the results showed no deception." *Id.*  In addition, the defendant "continues to receive mental health counseling." *Id.*

Judge Boardman said, *id.* at 645: "Here, Probation has not identified any reason—specific to Mr. Gaskin—why the polygraph condition should be imposed on him.  The only reason

Probation has identified is its belief that polygraphs 'are beneficial for the effective supervision of an individual under supervision for a sex offense and provide . . . an additional tool to support and encourage an individual's compliance with the requirements of supervision.' That generalized reason—applicable to all sex offenders under federal supervision—does not cut it." She also said, *id.* at 648: "Probation has not tailored its request to the specific circumstances of Mr. Gaskin, and it has not supported its request with facts unique to him." Therefore, the court denied USPO's motion to modify Gaskin's condition of supervised release. *Id.* at 649.

In a vacuum, the Petition (ECF 9) does not appear specific to Sessa. Rather, the request appears to be generic, in connection with a blanket policy by USPO in the District of Maryland. But, at the time, USPO believed defendant had consented, which may have affected the level of detail that USPO included in the Petition.

As noted, ECF 9 states, in part, *id.* at 1:

Mr. Sessa has been participating in sex offender treatment since the beginning of supervision. He is currently enrolled at Anne Arundel Counseling and is attending both individual and group therapy. It should also be noted that he has participated in various polygraph testing to ensure compliance with his supervision and also his treatment plan since his release.

As the court is aware, there have been some changes to condition language over the years and the U.S. Probation Office would like to update the language in Mr. Sessa's judgment and also give him credit for his participation in sex offender treatment, which also includes participation in polygraph testing. His current judgment does not specifically state he is required to participate in polygraph testing.

As discussed, blanket policies are not an adequate basis for the condition. *See, e.g.*, *Wroblewski*, 781 F. App'x at 162–63 ("'[A] court may not categorically impose [a particular] condition in every child pornography case that comes before it . . . . [T]he district court must decide whether to impose such a condition based on specific facts.'") (citation omitted; some alterations in *Wroblewski*).

In terms of evidence relating to the requested polygraph condition, USPO and the government both point to a September 2023 monthly sex offender treatment report signed by Kathryn Chumney, one of Sessa's treatment providers at Anne Arundel Counseling.  ECF 48 at 3 (government's brief); *see also* ECF 33 at 5–6 (Sessa's brief, stating that Officer Turro emailed the report to defense counsel).   Although I am not aware of any case requiring a specific recommendation for polygraph testing from a treatment provider, such a recommendation is certainly helpful to the Court in determining whether polygraph testing is appropriate outside of treatment, and when treatment has concluded.  *See, e.g.*, *Warren*, 843 F.3d at 279 (affirming imposition of polygraph condition despite no recommendation from treatment provider).

As noted, the pertinent language of the report purportedly states, ECF 33-1 at 1: "I believe polygraphs can be used to maintain reduced risk factors and for accountability for Mr. Sessa. While Mr. Sessa continues to do very well in treatment, has a stable and healthy work environment, and is in a good place that does not mitigate the realistic aspects of his triggers and interests related to his sexual offense."  However,  defense counsel contends that USPO added this language to the report.  Specifically, defendant states that the document sent to defense counsel from USPO (ECF 33-1) differs from the document defendant received in discovery from the treatment provider (ECF 33-2).  Although both documents are purported copies of the September 2023 Report, the former features the polygraph recommendation, while the latter does not.  ECF 33 at 7.  Moreover, Sessa included in his Motion a screenshot showing that the document was last edited by Officer Turro, not Chumney.  *Id.*[15]

---

[15] I note that the report was signed by Chumney on September 30, 2023.  ECF 33-1 at 2. But, Officer Turro requested the modification on August 7, 2023.  ECF 9.  In other words, USPO could not have made the requested modification with Chumney's recommendation in mind.

The government's brief is silent on the issue. Nor has USPO addressed the matter. But, it is noteworthy that, in his supplemental brief, Sessa does not raise the issue again, even though other issues are revisited. *See* ECF 47. And, it is not mentioned in the Reply, even to point out the government's silence. *See* ECF 50. The failure of the defendant to renew the issue suggests that any alteration to the September 2023 Monthly Treatment Report was made with Chumney's consent.

In any event, the burden is on the government and/or probation, who seek the modification, to produce evidence supporting the requested discretionary condition. *See Ellis*, 984 F.3d at 1100 n.6. They produced the September 2023 Monthly Treatment Report. ECF 37-2. At that point, the burden shifted to Sessa to show that the recommendation was not legitimate. Despite two hearings (ECF 34; ECF 36), defendant did not call either Officer Turro or Chumney as a witness. Indeed, before the third scheduled hearing, the Court wrote to the lawyers, pointing to the discrepancy regarding the September 2023 Report, and advised the parties that they had a right to call witnesses. ECF 55. Defense counsel advised that a hearing was unnecessary. ECF 57. Accordingly, I shall assume that the content of the Chumney report is accurate.

Sessa also complains that Chumney's recommendation is a "generalized statement about the usefulness of polygraphing when it comes to people convicted of sex offenses in general.[]" ECF 33 at 17. I disagree. Although the recommendation is merely two sentences, it mentions Sessa by name twice and refers to "*his* triggers and interests related to *his* sexual offense." ECF 33-1 at 1 (emphasis added).

In addition, Sessa argues that it "appears" Chumney recommended polygraphs only in the course of treatment, not outside of treatment. ECF 50 at 2. The report states, *id.*: "I believe polygraphs can be used to maintain reduced risk factors and for accountability for Mr. Sessa." I

do not read this language as narrowly as Sessa. "[R]isk factors" are relevant to compliance with conditions of supervised release, such as viewing pornography, or viewing minor males on the internet or contacting them.

In any event, my decision does not turn on Chumney's recommendation. Notably, Erin Stephens, the forensic psychotherapist at Anne Arundel Counseling who drafted Sessa's Psychosexual Evaluation Report on February 3, 2022, also recommended polygraph testing after examining Sessa. She said, ECF 37-1 at 10 (emphasis added): "Complete periodic supervisory polygraph examinations to increase accountability and *compliance with probation* and treatment conditions." This recommendation clearly suggested polygraph testing outside of treatment.

In *Gaskin*, the treatment provider did not mention the defendant in the recommendation. *Gaskin*, 759 F. Supp. 3d at 648. Instead, it was a "generic letter" explaining the "clinical uses of polygraphs in sex offender treatment . . . ." *Id.* In contrast, Stephens has recommended polygraphing of defendant outside the scope of treatment. To be sure, the recommendation is now more than three years old, and was made before Sessa began treatment at Anne Arundel Counseling. But, it remains useful.

Perhaps most significant, this case is factually distinguishable from *Gaskin*. Critically, Mr. Gaskin did not engage in any problematic behavior whatsoever while on supervised release. *Id.* In contrast, and as discussed, in December 2019, Sessa viewed pornography on "his mother's computer and a work phone," which are not monitored by USPO, and he did so on multiple occasions. ECF 5. This behavior is troubling because of the nature of the offense and the conduct, and also because it suggests that defendant may have acted with deception. Then, in January 2022, defendant viewed images and videos of minor males. ECF 7. He did the same in April 2022. *Id.* Then, in May 2022, defendant had a catalogue of minor males on his phone. And, in June 2022,

defendant edited photos of minor males. Defendant also admitted to contacting minors at some point in 2022. *See* ECF 37-1 (Psychosexual Evaluation Report of 2/3/22), at 5.

Additionally, Gaskin had previously submitted to several polygraph examinations, and the results showed no deception. *Gaskin*, 759 F. Supp. 3d at 647. In marked contrast, I was informed during the hearing on April 10, 2024, that defendant had taken six polygraphs and two of them indicated deception. *See also* ECF 37-1 at 5 (defendant stated during his Sex Offender Specific Evaluation of January 19, 2022, that he failed "polygraph examinations"); *id.* at 2 (defendant was referred to Anne Arundel Counseling "for a Sex Offender Specific Evaluation by his probation agent *in response to failing polygraph evaluations*.") (emphasis added).

As I see it, the proposed polygraph condition is "reasonably related" to assuring that defendant is afforded therapeutic intervention, if necessary. *See* 18 U.S.C. § 3583(d)(1); 18 U.S.C. § 3553(a)(2)(D). As the government explains: "Polygraphs are intended to encourage honesty with a probation officer and help determine whether additional therapeutic intervention is necessary." ECF 48 at 1. Indeed, defendant was referred to Anne Arundel Counseling "for a Sex Offender Specific Evaluation by his probation agent *in response to failing polygraph evaluations*." ECF 37-1 at 2. Sessa's contention that the polygraph condition will be used "solely for law enforcement purposes" is directly undermined by the factual record. ECF 33 at 22.

The proposed polygraph condition is also "reasonably related" to providing adequate deterrence, *see* § 3553(a)(2)(B), and protecting the public from further crimes of defendant, *see* § 3553(a)(2)(C). The polygraph condition would help assure defendant's compliance with the conditions of supervised release, which are in place, at least in part, to deter defendant from committing further crimes and to protect the public. *See, e.g.*, *United States v. Lee*, 315 F.3d 206, 217 (3d Cir. 2003) (recognizing that a polygraph condition can help protect the public and enhance

supervision); *United States v. Johnson*, 446 F.3d 272, 277 (2d Cir. 2006) ("[T]he incremental tendency of polygraph testing to promote . . . candor furthers the objectives of sentencing by allowing for more careful scrutiny of offenders on supervised release."); *Owens v. Kelley,* 681 F.2d 1362, 1370 (11th Cir. 1982) (stating that the polygraph test may act to deter the supervisee "from violating the terms of his probation by instilling in him a fear of detection").

In particular, the proposed condition can be used to determine whether defendant has viewed pornography; contacted minors; viewed images or videos of minors; or obtained access to technological devices not subjected to tracking by USPO. As discussed, while on supervised release, Sessa has engaged in all four types of conduct. Of import, several of defendant's troubling behaviors were discovered through the administration of a polygraph examination. *See* ECF 5 (Sessa admitted to viewing adult pornography during a polygraph); 37-1 at 5 (Sessa admitted to contacting minors and utilizing unsupervised technological devices during a polygraph).

In sum, after considering all of the facts and circumstances of this case, I conclude that the polygraph condition is individualized to Sessa and "reasonably related" to the sentencing factors set forth in 18 U.S.C. § 3583(d)(1).

### B.  18 U.S.C. § 3583(d)(2)

As explained, I must next ensure that the proposed polygraph condition "involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)[.]"  18 U.S.C. § 3583(d)(2).  Specifically, the applicable factors include providing adequate deterrence, *see* § 3553(a)(2)(B); protecting the public from further crimes of the defendant, *see* § 3553(a)(2)(C); and providing the defendant with training, medical care, and/or treatment, *see* § 3553(a)(2)(D). On the facts of this case, the proposed condition is overbroad and fails under 18 U.S.C. § 3583(d)(2).

Judge Boardman's decision in *Gaskin* is pertinent.  Although she did not decide whether the condition was overbroad under 18 U.S.C. § 3583(d)(2), because she determined that the condition did not satisfy the reasonably related requirement of 18 U.S.C. § 3583(d)(1), Judge Boardman raised concerns over "what topics may be covered"; the absence of a limitation on the frequency of polygraph tests; and the duration of the polygraph condition "for the entire period of supervised release, even if Mr. Gaskin continues to pass the polygraphs and perform well under supervision."  *Gaskin*, 759 F. Supp. 3d at 648 n.16.  Sessa points out that Chumney did not recommend that Sessa be subjected to polygraph testing in perpetuity.  ECF 33 at 8, 9.

At the hearing of April 5, 2024, the government acknowledged that polygraphing is intrusive.  And, because of reliability concerns, it is well established that polygraph evidence "is inadmissible in nearly every circumstance at trial."  *Dotson*, 324 F.3d at 261.  However, the polygraph "may deter lying notwithstanding its arguable or occasional unreliability because of the subject's fear that it might work, or be credited by others whether it works or not."  *Johnson*, 446 F.3d at 277.

Moreover, I am mindful that Sessa is already subjected to serious deprivations of liberty. In particular, he was required to register as a sex offender.  Louisiana Case, ECF 47 at 3.  Defendant is also prohibited from (1) using the internet without approval of Probation; (2) associating with any minor unless the minor's parent or guardian is present; and (3) possessing or using any form of pornography or entering any location where pornography can be accessed.  *Id.* at 4.  USPO also monitors Sessa's electronic devices.  ECF 4.  Sessa argues that these conditions have been sufficient to effectively monitor and deter him.  ECF 33 at 23.

It is true that "routine computer monitoring review" revealed that defendant viewed photos and videos of minor males on two occasions in 2022.  ECF 7.  But, this is not a substitute for

polygraphing.  On December 18, 2019, "Sessa admitted *during the polygraph* that he viewed pornography 5–6 times on his mother's computer and a work phone."  ECF 5 (emphasis added). This suggests evasive conduct of the defendant that might not have been uncovered without a polygraph.

    In view of all the circumstances, I conclude that a modified version of the polygraph condition sought by USPO is most appropriate.  As noted, Sessa requests that if the Court is going to grant Probation's request, the Court "should: (1) provide that Probation may use polygraph results only to facilitate treatment, and not to 'inculpate' Mr. Sessa through a revocation petition or fresh criminal investigation; (2) limit questioning to those topics that are directly relevant to Mr. Sessa's supervised-release conditions; (3) order that, at the start of each polygraph exam, Mr. Sessa be informed that his supervised release cannot be revoked based on a valid invocation of his Fifth Amendment privilege against self-incrimination; and (4) limit the number of polygraphs to one per year."  ECF 50 at 2–3 (internal citations omitted).

    I will grant Sessa's second request, as written.  I will also grant Sessa's fourth request, with the proviso that USPO may conduct more than one polygraph per year upon a showing of good cause and with leave of court.

    Defendant cites *Dotson*, 324 F.3d at 261, in support of his first request.  ECF 50 at 2–3.  In *Dotson*, the Fourth Circuit affirmed the district court's imposition of a polygraph condition that was "contemplated as a potential treatment tool," as opposed to being "aimed at gathering evidence to inculpate or exculpate" the defendant.  *Id.* at 261.  But, the Fourth Circuit did not state that using the information obtained from a polygraph to inculpate the defendant is forbidden.  Therefore, I decline to adopt Sessa's first request—that Probation be prohibited from using the information obtained during a polygraph session in a revocation petition or criminal investigation.

I also decline to adopt Sessa's third request—"that at the start of each polygraph exam, Mr. Sessa be informed that his supervised release cannot be revoked based on a valid invocation of his Fifth Amendment privilege against self-incrimination[.]"  ECF 50 at 3.  The overarching purpose of the polygraph condition is to promote candid communications between Sessa and his probation agent.  Among other things, the condition is also meant to provide defendant with treatment, if necessary, and to protect the public.  To accomplish these goals, Sessa must answer the questions posed to him by his probation agent.  If he chooses to invoke his Fifth Amendment rights, it will be up to Probation as to whether to notify the Court and whether to proceed with a request for a violation hearing.

## V.  Conclusion

For the foregoing reasons, I shall grant the Motion (ECF 33) in part and deny it in part. Specifically, I shall permit USPO to administer polygraphs to defendant, subject to the limitations above.  An Order follows.


Date: June 30, 2025                                    _____/s/_____

                                                       Ellen Lipton Hollander
                                                       United States District Judge

42